# In the United States Court of Federal Claims

No. 14-202C
(E-Filed Under Seal: June 30, 2014)
(Reissued: July 15, 2014)[1]

| | |
|---|---|
| RUSH CONSTRUCTION, INC., ) | |
| ) | |
| Plaintiff, ) | |
| ) | Post-Award Bid Protest; Cross- |
| v. ) | Motions for Judgment on the |
| ) | Administrative Record; Whether |
| THE UNITED STATES, ) | the GAO Decision was Rational. |
| ) | |
| Defendant, ) | |
| and ) | |
| ) | |
| C&D CONSTRUCTION, INC., ) | |
| ) | |
| Defendant-Intervenor. ) | |
| ) | |

James E. Krause, Jacksonville, Fla. for plaintiff.

William J. Grimaldi, Trial Attorney, with whom were Stuart F. Delery, Assistant Attorney General; Robert E. Kirschman, Jr., Director; and Deborah A. Bynum, Assistant Director, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant.  Susan E. Symanski, Assistant Director Counsel, U.S. Army Corps of Engineers, Jacksonville, Fla., of counsel.

Lawrence M. Posen, Washington, D.C., with whom were Christian F. Henel, Daniel P. Broderick and Daniel F. Edwards, for defendant-intervenor.

_____

[1]      This Opinion was issued under seal on June 30, 2014.  The parties were given the opportunity to request redactions, however none were requested.  The original Opinion is hereby unsealed and reissued without redaction.

<u>OPINION AND ORDER</u>

CAMPBELL-SMITH, Chief Judge

 This is a post-award bid protest related to a contract for the repair of a lock and barge canal in Florida.  The procuring agency is the United States Army Corps of Engineers Jacksonville District (agency, Corps or defendant).  RUSH Construction, Inc. was the low bidder (RUSH or plaintiff), and C&D Construction, Inc. was the second lowest bidder (C&D or defendant-intervenor).  RUSH's bid schedule included a discrepancy that the Contracting Officer waived as a minor informality under FAR 14.405.  The agency then accepted RUSH's bid as responsive and awarded it the contract.

 C&D filed a bid protest with the United States Government Accountability Office (GAO), which GAO sustained on February 14, 2014.  GAO recommended that the agency reject RUSH's bid as nonresponsive and terminate the contract for the convenience of the government.  The agency informed both RUSH and C&D that it would accept GAO's recommendation, but it has delayed the termination of RUSH's contract pending the outcome of this protest.

 RUSH filed this bid protest on March 11, 2014, seeking a ruling that the agency's determination to award the contract to C&D is arbitrary, capricious and contrary to law, and requesting a permanent injunction enjoining the agency from awarding the contract to C&D.

 The parties filed cross-motions for judgment upon the administrative record under Rule 52.1 of the Rules of the United States Court of Federal Claims (RCFC).  The motions have been fully briefed and are ripe for decision.  Oral argument was not deemed necessary by the court.  For the reasons explained below, the court **GRANTS** plaintiff's motion for judgment on the administrative record (ECF No. 19); **DENIES** defendant's cross-motion for judgment on the administrative record (ECF No. 21); and **DENIES** C&D's cross-motion for judgment on the administrative record (ECF No. 20).

I. Background

 A. Solicitation

 The agency issued Solicitation No. W912EP-13-B-0007 (Solicitation) on August 2, 2013, requesting bids to repair a lock located in Canaveral Harbor, Brevard County, Florida.  Tab 1, AR[2] 1.  Bidders were required to submit a bid for the repair of both the

---

[2] Defendant filed the Administrative Record (AR) on March 20, 2014.

west wall (known as the base option) and the east wall (known as option A), but the agency reserved the right to award a contract for the base option only.  Tab 1A, AR 13 (quoting FAR 52.217-5).  As explained in the solicitation, the agency would evaluate bidders on the "aggregate" of their base and option A bids.  Id. (quoting FAR 52.217-5).

According to the Contracting Officer, the purpose of the contract was "to provide a repair for the Canaveral Lock East and West timber approach walls to prevent failure and restore the walls to an operational condition."  Tab 21, AR 1022.  As relevant to this protest, the work included the removal and replacement of the fenders that lined both the east and west walls of the lock (known as fender installation).  Tab 1B, AR 207 ("Fiber-reinforced plastic fenders . . . will be removed and either replaced or reinstalled as detail[ed] in the contract drawings.").

Between August 19, 2013 and September 6, 2013, the agency issued five amendments to the solicitation.  Tabs 2-6, AR 437-923.  Amendment no. 5 is relevant to this protest.

In Amendment no. 5, the Corps made changes to the fender installation work, including changes to the bid schedule and accompanying notes, Tab 6, AR 901-03, the Summary of Work section, id. at 906-07, the Measure and Payment section, id. at AR 918, and the contract drawings, id. at 921-23.  The Corps also included two annotations to the bid schedule, specifically Notes 6 and 9.  Id. at 903.  The annotation "See Note 9" was included after the fender installation line item on the west wall (base option) bid schedule, and "See Note 6" was included after the fender installation line item on the east wall (option A) bid schedule.  Id. at 901-02.  The notes in their entirety are set forth below.

> Note (6) Fender installation includes the reuse and reinstallation of the approximately 1190 linear feet of fiber reinforced fenders, which are currently the bottom two rows on the existing guidewall. The remaining quantity for this bid item includes the procurement, material and installation of the new fiber reinforced fenders.  (FOR OPTION [A] ONLY)
>
> Note (9) The entire quantity for this bid item [Fender Installation] includes the procurement, material, and installation for new fiber reinforced fenders. (FOR BASE BID ONLY)

Id. at 903.

This was a sealed bid solicitation, also known as an Invitation for Bids (IFB).  Tab 1A, AR 3.  Sealed bidding is subject to Federal Acquisition Regulations (FAR) part 14.  FAR pt. 14 (Sealed Bidding). The agency also included in the solicitation FAR 52.214-3, which stipulates that "[b]idders shall acknowledge receipt of any amendment to this solicitation, . . . . [and] [t]he Government must receive the acknowledgment by the time and at the place specified for receipt of bids."  Tab 1A, AR 10-11 (quoting FAR 52.214-3(b)).

B.     Bid Opening and RUSH's Bid Schedule

The agency held the bid opening on September 13, 2013, with representatives of both RUSH and C&D in attendance.  Tab 22, AR 1028-29.  According to the Contracting Officer, as RUSH's bid was opened, she "discovered that Rush Construction's bid schedule's numbering sequence of line items did not match the numbering sequence of line items provided in the solicitation."[3]  Tab 21, AR 1025.  The bid schedule was a two-page document.  Tab 6, AR 901-02.  The first page of that document contained the bid for the west wall (base option) work, and the second page contained the bid for the east wall (option A) work.  Id.  The discrepancies at issue occurred only on page two of RUSH's bid.  Shortly after the bid opening, the Contracting Officer prepared a memorandum for the record describing the detected "mistake" in RUSH's bid.

> Rush Construction acknowledged all five (5) amendments, which changed the bid schedule.  However, in review of Rush Construction's bid, the contractor duplicated the bid schedule incorrectly.  The line item numbering for the option [A, or the east wall, bid] incorrectly included 0001 vs. 0002 for all line items.  However, the title, quantities and all material aspects of the bid schedule was correct.

> I determined that the bid submitted by Rush Construction was responsive with terms and conditions that do not vary from the terms and conditions of the solicitation.  In addition, I determined the <u>mistake in the bid schedule was a minor informality with an immaterial defect in the bid that was merely a matter of form and not of substance and did not affect price, quantity or quality in accordance with FAR 14.405</u>, Minor informalities or

---

[3]     Contract line item numbers were a six-digit alpha/numeric combination, with "1" as the fourth digit for each west wall (base option) line item, and "2" as the fourth digit for each east wall (option A) line item. Tab 6, AR 901-02.  For example, the first line item on each bid was for Pile Bent Demolition & Disposal, which was denoted as line item 0001AA for the west wall and 0002AA for the east wall.  Tab 6, AR 901-02.

irregularities in bids.  Rush Construction was given the opportunity to correct the bid schedule and re-submitted the bid schedule with only a change to the line item number in accordance with FAR 14.405.[4]

Tab 9, AR 927 (emphasis added).  RUSH was announced as the apparent low bidder at the conclusion of the bid opening. Tab 21, AR 1025.  The agency awarded RUSH the contract on November 7, 2013.  Compl. ¶ 34, ECF No. 1; Tab 29, AR 1070-86.

RUSH explained that it typed the bid schedule into an Excel spreadsheet to avoid computation errors, then copied page one (west wall/base option bid) to use as page two (east wall/option A bid).  Pl.'s Mot. 7 ¶¶ 11-12, ECF No. 19.  While it made some edits to the copied page, the edits were incomplete and some information appropriate only to page one remained on page two.  See id. at ¶¶ 12-13.  The errors on page two of RUSH's bid schedule included the error that the Contracting Officer decided to waive before awarding the contract to RUSH, and two other errors that were, as discussed below, the subject of the later GAO decision.

C.     Protest by C&D Construction at GAO and the Resultant Decision

On November 11, 2013, C&D filed a protest with GAO, Tab 19, AR 1003-17, in which it asked GAO to review the documents provided by RUSH to determine if RUSH's "bid meets the requirements of the solicitation," id. at 1004.  C&D alleged that RUSH "did not use the bid forms provided in the solicitation [and that] [t]he form [RUSH used] did not contain the information provided in the solicitation and [it] contained errors." Id.

C&D further alleged that "Note #6 . . . WAS NOT acknowledged by RUSH Construction's bid." Tab 31, AR 1094.  C&D continued, "Note #6 has *large* value which [a]ffects price, quantity, quality and is not negligible when contra[s]ted with the total cost or scope of the supplies or services being acquired."  Tab 31, AR 1094.

---

[4]      In relevant part, FAR 14.405 states, "[a] minor informality or irregularity is one that is merely a matter of form and not of substance. It also pertains to some immaterial defect in a bid or variation of a bid from the exact requirements of the invitation that can be corrected or waived without being prejudicial to other bidders. The defect or variation is immaterial when the effect on price, quantity, quality, or delivery is negligible when contrasted with the total cost or scope of the supplies or services being acquired. The contracting officer either shall give the bidder an opportunity to cure any deficiency resulting from a minor informality or irregularity in a bid or waive the deficiency, whichever is to the advantage of the Government." FAR 14.405.

In its decision, GAO referred to both of the allegations made by C&D.

> C&D argues that RUSH's original bid did not commit the firm to complying with Note [6][5] [and to] performing the east wall fender installation. . . . [Also as to] the significance of both pages of RUSH's schedule referring to the west wall base requirement, C&D argues that [it] rendered RUSH's bid ambiguous and unacceptable.

Tab 38, AR 1120 (internal citations omitted).

GAO issued its decision on February 14, 2014, finding that RUSH's bid was nonresponsive and sustaining C&D's protest. Id. at 1122. GAO determined that "RUSH's bid schedule differed materially from the terms of the IFB," the discrepancies could not be waived, and thus RUSH's bid should have been rejected as nonresponsive. Id. at 1120.

GAO based its decision on two discrepancies on page two of RUSH's bid schedule: (1) the top of page two was titled "West Approach Wall Repair," rather than "East Approach Wall Repair;" and (2) the note next to the line item for fender installation said "See Note 9," rather than "See Note 6." See id.; Tab 8, AR 926. GAO did not disagree with the Contracting Officer's finding that RUSH's incorrect contract line item numbering was a minor informality, and this additional discrepancy played no role in the GAO's decision. See Tab 38, AR 1122. According to GAO,

> [t]he [two additionally identified] discrepancies in RUSH's bid . . . were not a mere minor informality. Both pages of RUSH's bid schedule identified the scope of work being bid as the west wall; neither identified any prices as applying to the east wall. The second page of the schedule, which should have contained prices for the east wall work identified Note 9 (the west wall fender installation note) as applicable, rather than Note 6 (which, as revised by Amendment 5, required the reuse of fender material). As a result, at the time of bid opening, RUSH had not made a firm commitment to perform the east wall scope of work at specific line item prices.

> Although the contracting officer identified misnumbering on the second page of RUSH's bid schedule, and expressed her view that such a discrepancy could be waived as a minor informality, she did not identify

---

[5]    GAO mistyped this as Note 9. Review of C&D's allegations shows that C&D alleged RUSH failed to acknowledge Note 6. See Tab 31, AR 1094.

the fact that RUSH's bid also referred only to the west wall base requirement, and reference[d] only Note 9 for fender installation.  Since these discrepancies reflected material differences in the work and the manner of its performance, they could not be waived–even if the contracting officer had identified them.  In short, the contracting officer improperly allowed RUSH to correct its nonresponsive bid.

Id. at 1121-22 (footnote omitted).

GAO recommended "that the Corps revoke the waiver of the discrepancies in RUSH's bid, reject RUSH's bid as nonresponsive, and terminate the contract [award to RUSH] for the convenience of the government[, and] . . . that the Corps identify the next lowest-priced responsive responsible bidder, and make award to that firm, if otherwise proper."  Id. at AR 1122.

The agency informed both RUSH and C&D that it intended to "accept and adhere" to GAO's recommendation.  Tabs 39-40, AR 1126-27.  RUSH notes, however, that the Corps has not cancelled its contract with RUSH, and it has stayed the implementation of GAO's recommendation pending a decision in this protest.  Compl. ¶¶ 23, 129.

D.      Protest by RUSH Construction in the Court of Federal Claims

RUSH filed the instant bid protest on March 11, 2014, asserting that any errors in its bid schedule were minor informalities that did not affect price, quantity, or quality and thus, could be waived under FAR 14.405.  Id. at ¶¶ 83, 88.  RUSH seeks a ruling that the agency's determination to award the contract to C&D is arbitrary, capricious and contrary to law, as well as a permanent injunction enjoining the agency from awarding the contract to C&D.  Id. at 32-33.

A protective order was entered on March 14, 2014.  ECF No. 9.  The court granted C&D's motion to intervene on March 20, 2014, ECF No. 14, and defendant filed the administrative record on March 20, 2014.

On April 4, 2014, RUSH filed a motion for judgment on the administrative record. Pl.'s Mot., ECF No. 19.  Defendant filed its cross-motion on April 17, 2014, Def.'s Mot., ECF No. 21, as did C&D, Def.-Int.'s Mot., ECF No. 20.  RUSH filed its reply on May 2, 2014.  Pl.'s Reply, ECF No. 30.  On May 15, 2014, defendant filed its reply, ECF No. 33, as did C&D, ECF No. 34.

## II.     Discussion

The court examines the case law relied upon by GAO in its decision, and the relevant facts in the administrative record.  The court then considers whether GAO's decision was rational.  Finally, the court considers whether RUSH has shown prejudice.

### A.     Standard of Review

#### 1.     Standing

The Tucker Act grants this court jurisdiction "to render judgment on an action by an interested party objecting to . . . the award of a contract . . . in connection with a procurement." 28 U.S.C. § 1491(b)(1) (2012).  The term "interested party" limits standing to "'actual or prospective bidders . . . whose direct economic interest would be affected by the award of the contract.'"  Rex Serv. Corp. v. United States, 448 F.3d 1305, 1307 (Fed. Cir. 2006) (quoting Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001)).  "[T]o prove the existence of a direct economic interest, a party must show that it had a 'substantial chance' of winning the contract." Orion Tech., Inc. v. United States, 704 F.3d 1344, 1348 (Fed. Cir. 2013) (citing Rex Serv., 448 F.3d at 1308).  Courts interpreting the substantial chance standard for standing have held that it requires a showing of "'viability' . . . turning on the reasonableness of the likelihood of prevailing on the prospective bid taking the protestor's allegations as true.'" Lyon Shipyard, Inc. v. United States, 113 Fed. Cl. 347, 355 n.5 (2013) (quoting McKing Consulting Corp. v. United States, 78 Fed. Cl. 715, 721 (2007)).

Neither defendant nor C&D challenged RUSH's standing in this matter.  RUSH was an actual bidder, and was determined by the agency to be the low bidder.  As such, it meets the substantial chance requirement.  The court finds that RUSH has standing to bring this protest.

#### 2.     Merits

The Administrative Procedure Act (APA) standard of review applies to the court's examination of an agency's decision, which means that the court will set aside an agency decision only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A) (2012).  Rule 52.1 permits the court to review an administrative record and to issue a ruling on a motion for judgment on that record.  RCFC 52.1(c).

The Federal Circuit has said that "[u]nder the APA standard . . . 'a bid award may be set aside if either (1) the procurement official's decision lacked a rational basis; or (2)

the procurement procedure involved a violation of regulation or procedure.'" Banknote Corp. of Am., Inc. v. United States, 365 F.3d 1345, 1351 (Fed. Cir. 2004) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).  Plaintiff must make its showing by a preponderance of the evidence. See, e.g., AmerisourceBergen Drug Corp. v. United States, 60 Fed. Cl. 30, 35 (2004).

According to the Supreme Court,

[u]nder the 'arbitrary and capricious' standard the scope of review is a narrow one. A reviewing court must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. . . . Although this inquiry into the facts is to be searching and careful, the ultimate standard of review is a narrow one. The court is not empowered to substitute its judgment for that of the agency.' Citizens to Preserve Overton Park v. Volpe, [401 U.S. 402, 416 (1971)]. The agency must articulate a 'rational connection between the facts found and the choice made.' Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962). While we may not supply a reasoned basis for the agency's action that the agency itself has not given, SEC v. Chenery Corp., 332 U.S. 194, 196 (1947), we will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.  Colorado Interstate Gas Co. v. FPC, 324 U.S. 581, 595 (1945).

Bowman Transp., Inc. v. Arkansas-Best Freight System, Inc., 419 U.S. 281, 285-86 (1974); see also Weeks Marine, Inc. v. United States, 575 F.3d 1352, 1368-69 (Fed. Cir. 2009) (stating that under rational basis review, the court will "sustain an agency action evincing rational reasoning and consideration of relevant factors") (internal quotation marks omitted).

In the context of a bid protest in which the agency has accepted the recommendation of GAO, the court must determine, on review, whether

the [agency] justifiably followed the GAO's recommendation . . . . The Claims Court [has] recognized that the controlling inquiry in deciding th[is] question was whether the GAO's decision was a rational one.

Honeywell, Inc. v. United States, 870 F.2d 644, 647 (Fed. Cir. 1989) (emphasis added), rev'g 16 Cl. Ct. 173 (1989).

As the Federal Circuit has further explained:

> [A] procurement agency's decision to follow the Comptroller General's recommendation, even though that recommendation differed from the contracting officer's initial decision, [will be deemed] proper unless the Comptroller General's decision itself was irrational. [And,] "[i]f the court finds a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion as to the proper administration and application of the procurement regulations." M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971).

Id.; see also Turner Constr. Co. v. United States, 645 F.3d 1377 (Fed. Cir. 2011) (following Honeywell); Centech Grp., Inc. v. United States, 554 F.3d. 1029, 1039 (Fed. Cir. 2009) (following Honeywell).

The court may find that an agency's decision is irrational and should be overturned if the agency

> relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Turner Constr. Co. v. United States, 94 Fed. Cl. 561, 571 (2010) (quoting Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983)), aff'd, 645 F.3d 1377 (Fed. Cir. 2011).

As in the case at hand, "[w]here an agency simply implements a GAO recommendation, the inquiry focuses on the rationality of that GAO recommendation, even though the actual decision before the court is the agency decision," Turner Constr. Co., 94 Fed. Cl. at 572, and "an inquiry into the rationality of the GAO decision is the same as an inquiry into whether the agency had a rational basis for its decision," id. at 572 n.30.

The analysis of a "bid protest proceeds in two steps." Bannum, Inc., 404 F.3d at 1351. First, the court must determine whether the agency acted in either an arbitrary and capricious manner, without a rational basis or contrary to law. Id. Second, if the court

finds that the agency acted in error, the court must determine whether the error was prejudicial.  Id.  The Appeals Court has instructed that to establish prejudice, a protestor must show that there was a "substantial chance" it would have received the contract award, but for the agency's errors.  Id.  at 1353.

B.      Review of the Case Law Relied Upon by GAO

GAO relies on cases that variously fall into one of three lines of analysis—that is, either omitted price cases, unacknowledged solicitation amendment cases, or ambiguous bid cases.

1.      Omitted Price Cases

An omitted price case is one in which the bidder inadvertently left a blank line for one or more contract line items, or omitted an entire bid schedule required by the solicitation.  See, e.g., HH & K Builders, B-232140, 1988 WL 228028, at *1 (Comp. Gen. Oct. 20, 1988).  An omitted price is significant because a bid "that fails to include a price for every item required by the IFB generally must be rejected as nonresponsive." Tab 38, AR 1121 (citing HH & K Builders, 1988 WL 228028, at *1).

GAO cited three omitted price cases in which the discussion focused on the bidder's omission of either a price or a separate bid schedule, and whether that omission could be waived as a minor informality.  Tab 38, AR 1121 (citing Massillon Constr. & Supply, Inc., B-407931, 2013 WL 1281625, at *3 (Comp. Gen. Mar. 28, 2013); HH & K Builders, B-232140, 1988 WL 228028, at *2 (Comp. Gen. Oct. 20, 1988); United Food Servs., 65 Comp. Gen. 167, 169 (1985).

The test for determining whether an omission may be waived is whether "the item for which the price is omitted is divisible from the solicitation's overall requirements, [is] de minimis as to total cost, and would not affect the competitive standing of the bidders," were the omitted price added to the bid total.  Massillon Constr. & Supply, 2013 WL 1281625, at *3.  If the omission qualifies for waiver as a minor informality, the bid is responsive.  See, e.g., United Food Servs., 65 Comp. Gen. at 171 (observing that "the rule that prevents an obvious clerical error of omission from being converted to a matter of responsiveness is applicable here . . . .").

HH & K Builders failed to provide a price for one item in its bid and the agency rejected it as nonresponsive.  HH & K Builders, 1988 WL 228028, at *1.  In its GAO protest, HH & K claimed that the omission was an oversight, that it had intended to bid $0 for the item (a clearly de minimus amount), and that it should be allowed to correct its

bid under FAR 14.405.  Id.  GAO denied HH & K's protest, finding that the omitted price was not divisible from the information in the bid, as there were no similar line items in the bid.  Id. at *2.

Similarly, in Massillon Construction, GAO found that price information on an omitted schedule was not divisible from the other prices in the bid.  Massillon Constr. & Supply, 2013 WL 1281625, at *4.  Thus, the omission of the required schedule could not be waived as a minor informality under FAR 14.405.  Id.

In contrast, in United Food Services, GAO found that the omitted prices were divisible from information in the bid and sustained the protest.  United Food Servs., 65 Comp. Gen. at 171.  The agency issued Amendment no. 2 to the IFB, which required bidders to submit bids to provide services in three dining facilities not included in the original solicitation, for a base year and four subsequent one-year options.  Id. at 168.  For one of the new facilities, United provided a bid for the base year, but omitted bids for each of the four one-year options.  Id.

Nonetheless, GAO found that a pattern of pricing existed from the base to option year bids for the two new dining facilities for which United did provide complete bids, such that a narrow range of prices for the omitted option year bids for the third dining facility could be discerned.  Id. at 170.  It was clear that even with the additional prices, United would remain the lowest bidder, thus the competitive standing of the bidders would be unaffected.  Id. at 171.

RUSH is not like HH & K Builders, Massillon Construction, or United Food Services because RUSH omitted no prices from its bid.  See Tab 8, AR 925-26.  The agency acknowledged as much, when it told GAO that in RUSH's bid, "all line items were priced and none were left off or added."  Tab 35, AR 1108.  Likewise, C&D acknowledged that "[t]he defect in Rush's bid is entirely different from the omitted line item price cases.  Rush's bid error was not a missing line item that was 'divisible from the solicitation,' . . . ."  Def.-Int.'s Mot. 22.

2.    Unacknowledged Amendment Case

An unacknowledged amendment case is one in which the bidder has failed to acknowledge receipt of an amendment to the solicitation prior to the bid opening.  FAR 52.214-3 requires that "[b]idders . . . acknowledge receipt of any amendment to this solicitation, . . . . [and] [t]he Government . . . receive the acknowledgment by the time and at the place specified for receipt of bids."  FAR 52.214-3(b).  A bidder's failure to

acknowledge an amendment can render its bid nonresponsive.  See, e.g., Pro Alarm Co., 69 Comp. Gen. 727, 727-28 (1990).

GAO cites Pro Alarm Company for the proposition that the bidder's failure to acknowledge an amendment to the solicitation may be waived where the amendment results in less stringent obligations on the bidder.  Tab 38, AR 1121 n.8 (citing Pro Alarm Co., 69 Comp. Gen. 727 (1990)).  The agency had rejected Pro Alarm's bid as nonresponsive due to its failure to acknowledge the one amendment to the IFB.  Id. at 727-28.  GAO's analysis in Pro Alarm Company focused on whether the amendment was material.  An amendment is material if it imposes legal obligations on the contractor that were not contained in the original solicitation.  Versailles Maint. Contractors, Inc., B-203324, 1981 WL 23222, at *3 (Comp. Gen. Oct. 19, 1981).  The failure to acknowledge a material amendment cannot be waived, and the failure to acknowledge such an amendment renders a bid nonresponsive.  Pro Alarm Co., 69 Comp. Gen. at 728.

The amendment at issue in Pro Alarm Company increased the amount of time allotted to the contractor for the completion of the work.  Id. at 729.  It imposed no additional obligation on the contractor, and thus was not a material amendment.  Id. GAO found that because the amendment was not material, Pro Alarm Company's failure to acknowledge the amendment could be waived, and it sustained the protest.  Id. at 728.

Pro Alarm Company is distinguishable from this case.  GAO stated in its decision that RUSH acknowledged all five amendments to the solicitation.  Tab 38, AR 1118 ("RUSH's bid identified the IFB, and acknowledged each of the five amendments by its number and date."); see also Tab 24, AR 1039 (RUSH's signed acknowledgement).

Nonetheless, GAO relied on the Pro Alarm Company case as it considered the materiality of the work specified in Note 6 to the bid schedule in Amendment no. 5.  Tab 38, AR 1121 n.8.  According to GAO, if the specified work was not deemed material, then RUSH's "reference to the incorrect note [Note 9 instead of Note 6 written next to the east wall (option A) fender installation line item] could be considered immaterial," and thus waived.  Tab 38, AR 1121 n.8.

> We recognize that the possibility that the revised Note 6 requirement to reuse fender material might impose a less stringent obligation than Note 9's requirement to furnish all new material, which the Corps argues was reflected in lower per-foot pricing for that line item in 8 of the 11 bids. Agency Response to GAO Questions, Feb. 4, 2014, at 2.  Failure to acknowledge an amendment may be waived where the amendment results in less stringent obligations on the bidder. . . .  E.g., Pro Alarm Co., B-

240137, Sept. 20, 1990, 90-2 CPD ¶ 242 at 3 (failure to acknowledge amendment that extended completion time did not render bid nonresponsive).  However, even if some bidders offered lower per-foot pricing for the east wall fender installation, the record does not show that the Note 6 requirement was less stringent than Note 9.  Rather (as C&D argues) removing existing fender material requires the contractor to take additional steps to ensure that the material is removed without damage, and stored while other repairs are made, and then reinstalled.  <u>See</u> C&D Response to GAO Questions, Feb. 4, 2013, at 3.  Since those additional steps would not be required if all new fender material were to be used, <u>we have no basis to regard the fender reuse requirement or revised Note 6 to be less stringent than the all-new-material requirement of Note 9, so that [the] reference to the incorrect note could be considered immaterial.</u>

<u>Id.</u> (emphasis added).

By analyzing the omission of a bid schedule note under <u>Pro Alarm Company</u>, GAO equates such an omission with an unacknowledged solicitation amendment.  But GAO offers no explanation for why it made this comparison.  There is no obvious parallel between the two fact scenarios, and GAO does not attempt to analogize the facts of <u>Pro Alarm Company</u> to those of RUSH.  GAO also does not explain why it thought it necessary that RUSH specifically "acknowledge" Note 6, when RUSH acknowledged Amendment no. 5, in which Note 6 was included.  Tab 38, AR 1118; Tab 24, AR 1039.  Because the <u>Pro Alarm Company</u> discussion has no apparent applicability to this case, GAO's reliance on it seems to be misplaced.

### 3.   Ambiguity Case

An ambiguity case is one in which the bid is susceptible to more than one <u>possible</u> interpretation.  If GAO determines there is more than one possible <u>reasonable</u> interpretation of the bid, it is ambiguous and thus, deemed nonresponsive.  <u>See</u>, <u>e.g.</u>, <u>J. Caldarera & Co.</u>, B-276201, 1997 WL 267537, at *1 (Comp. Gen. May 21, 1997) (citing <u>Sabreliner Corp.</u>, 64 Comp. Gen. 325, 328 (1985)).

In <u>Thompson Metal Fab</u>, the bidder erred by including photocopies of the bid schedule for option A, and using the copies as its bid schedule pages for Options B, C and D, without making the necessary edits to those pages.  <u>Thompson Metal Fab, Inc.</u>, B-293647, 2004 WL 964056, at *1 (Comp. Gen. May 4, 2004).

The agency had issued an amended bid schedule consisting of ten pages, two

pages each for base work and four separate options.  Id. at *1. Contractors were required to bid on all four options, with each option representing work on one of four separate gates for a lock and dam spillway project.  Id.  "For the successive additional gate options, the bid schedule contained essentially identical contract line item descriptions and quantities for each option, with only the contract line item numbers (CLINs) increasing in sequence."  Id.

Thompson copied its option A form three times, and on each form crossed out the "A" at the top of the page and wrote in either "B," "C," or "D."  Id.  Thompson neglected, however, to cross out the additional label "First Additional Gate," which remained on each form, although the gates in options B, C and D were, respectively, the second, third and fourth additional gates.  Id.  Thompson also failed to edit the bid subtotal price at the bottom of each bid, which incorrectly said "Total Option A," as well as the contract line item numbers, which differed for each of the four options.  Id.

GAO noted that the "second schedule page of options B, C and D in Thompson's bid was identical to the second page of its option A schedule."  Id. (emphasis added). GAO found that

> there was no clear indication within Thompson's bid that Thompson [had intended to] price[] approximately half of the option CLINs (those on the second page of options B, C, and D). This created doubt as to whether Thompson intended to furnish the services on those CLINs, and thus rendered its bid nonresponsive.

Id. at *2.

Unlike the Thompson case, the second page of RUSH's bid schedule was not an identical copy of its first page.  Although RUSH copied the second page of its bid schedule from the first, RUSH included four items of information that distinguished its second page from its first page.  See infra Part II.C.1.

C.     Review of the Administrative Record

1.     Page Two of RUSH's Bid Schedule

It is clear from RUSH's bid submissions that RUSH used the bid schedule accompanying Amendment no. 5.  The Corps had included a notation at the bottom of the bid schedule it provided stating "Revised to Accompany Amendment #0005."  Tab 6, AR 902.  The bid schedule RUSH submitted included this notation. Tab 8, AR 926.  The

second page of RUSH's bid schedule included information that would have been <u>correct</u> for the east wall (option A) bid; but it also contained information that would have been <u>incorrect</u> for that bid. GAO focused on the two pieces of incorrect information on page two in reaching its conclusion that RUSH's bid was non-responsive.[6]

Page two of RUSH's bid schedule included the following information—that correctly applied to the east wall (option A) bid and differed from the information provided on page one of RUSH's bid:

(1)     The fender installation line item quantity was listed as 5371 linear feet, correct for the east wall (option A) bid, which differed from the 4177 linear feet listed on page one, correct for the west wall (base option) bid;

(2)     The spare piling line item was omitted, correct for the east wall (option A) bid, but was included as the last line item on page one, correct for the west wall (base option) bid;

(3)     The subtotal of the line item prices for page two was labeled "Option 'A' (Line Items 0002 Thru 0002AN), which included both the correct title and contract line item number range for the east wall (option A) bid; and

(4)     The "aggregate" total of the page one and two line item prices was labeled, "Total Base Plus Option 'A' (Line Items 0001 Thru 0002AN)," which included both the correct title and contract line item number range for the west wall (base option) and east wall (option A) bids.  Tab 8, AR 926.

As pointed to by the GAO, the second page of RUSH's bid schedule also contained two items of incorrect information:

(1)     The heading at the top of page two said "<u>West</u> Approach Wall Repair," rather than "<u>East</u> Approach Wall Repair;" and

(2)     The note next to the fender installation line item said "See Note <u>9</u>," rather than "See Note <u>6</u>."  <u>See</u> Tab 38, AR 1121 (emphasis added); <u>see also</u> Pl.'s Reply 7 (providing annotated comparison of original and corrected bids).

GAO noted the first and third correctly included items set forth above, by making express reference to them in the background discussion section of its decision.  Tab 38, AR 1119.  But in the analysis section of its discussion, GAO was silent regarding the information on RUSH's page two that correctly pertained to the east wall (option A) bid. GAO's silence about how it viewed and weighed the four items of information that were

---

[6]     As stated <u>supra</u> Part I.C., GAO did not disagree with the Contracting Officer's assessment that a third error, incorrect line item numbering, was a minor informality under FAR 14.405.

correctly contained on the second page of RUSH's bid does not afford the court a meaningful opportunity to examine the reasoning that informed GAO's decision.

2.    Note 6 of Solicitation Amendment No. 5

As discussed supra Part II.B.2, GAO determined that the work specified in Note 6 was material and thus concluded that RUSH's omission of the words "See Note 6" from page two of its bid schedule could not be waived.  As reflected in its discussion, GAO treated the "See Note" language included on the bid schedule as the mechanism by which the agency bound the bidder to perform the work specified in that Note.  Based on this view, GAO concluded that RUSH's failure to include the phrase "See Note 6" next to the east wall (option A) fender installation line item constituted a failure to commit to reusing the 1190 linear feet of existing fenders, as specified in Note 6.  Tab 6, AR 903.  GAO reasoned:

> [t]he second page of the schedule . . . identified Note 9 (the west wall fender installation note) as applicable, rather than Note 6 (which, as revised by Amendment 5, required the reuse of fender material).  As a result, at the time of bid opening, RUSH had not made a firm commitment to perform the east wall scope of work at specific line item prices.

Tab 38, AR 1121.

The administrative record, however, provides no support for this interpretation of the "See Note" language on the bid schedule.  The court makes four specific observations regarding what the administrative record does provide.

First, in its response to questions issued by GAO, the Corps described both Notes 6 and 9 as "notes on how the material would be priced for this contract."  Tab 35, AR 1108.  In effect, the agency characterized both notes as pricing notes that provided information about which bidders were to be mindful when pricing their bids.  The notes proved effective in that regard.  As GAO observed, eight bidders provided lower per-foot pricing for their east wall (option A) fender installation line items based on their commitment to reuse 1190 linear feet of existing fenders and the resultant need to purchase fewer linear feet of fender material for the east wall (option A) work.  Tab 38, AR 1121 n.8.

The two page bid schedule furnished by the agency is followed immediately by the one page of notes, and all three pages bear the same title, "Line Items and Pricing

Schedule." Tab 6, AR 901-03.  Simply interpreting Notes 6 and 9 as pricing notes is consistent with their placement in the solicitation.

Second, the means by which the agency would bind the bidder to perform the work specified in a solicitation amendment was specifically addressed in the solicitation. "Bidders shall acknowledge receipt of any amendment to this solicitation, . . . . [and] [t]he Government must receive the acknowledgment by the time and at the place specified for receipt of bids."  Tab 1A, AR 10-11 (quoting FAR 52.214-3(b)).

In its decision, GAO recognized that RUSH acknowledged every amendment to the solicitation, including Amendment no. 5.  Tab 38, AR 1119 ("RUSH's bid identified the IFB, and acknowledged each of the five amendments by its number and date.").  But GAO did not explain why RUSH's acknowledgment of Amendment no. 5 was not a binding commitment to perform the fender installation work described, in part, in Note 6.  Nor did GAO explain how RUSH's writing of the wrong note number on the bid schedule served to invalidate RUSH's acknowledgment of Amendment no. 5.

Third, the scope of Amendment no. 5 patently exceeds the content of Notes 6 and 9.  A twenty-five-page amendment, Amendment no. 5 included detailed specifications about fender installation that went well beyond the information included in Notes 6 and 9.  For example, in the Amendment no. 5 Summary of Work, the agency included the following information about east wall (option A) fender installation.

> Project scope for Option 'A' is to provide the repair for the East timber approach walls to prevent failure and restore the wall to an operational condition. . . . <u>Fiber-reinforced plastic fenders and structural plastic framing will be removed and either replaced or reinstalled as detail[ed] in the contract drawings</u>.

Tab 6, AR 907 (emphasis added).

Amendment no. 5 also included three pages of detailed contract drawings and notes for the east wall work.  <u>See id.</u> at 921-23.  The drawing of the east wall plan includes a note with two arrows pointing to the bottom two rows of the east wall, specifying "existing [fiber-reinforced plastic] fenders."  <u>Id.</u> at 922.  A symbol next to this note indicates that it was "revised to accompany 0005," that is Amendment no. 5.  <u>Id.</u> The legend on the drawing, a series of dashes and dots, indicates that the bottom two rows of fenders are to be "removed and reused."  <u>Id.</u> at 922-23.  The directions in these three pages of contract drawings—regarding the removal and reuse of the bottom two rows of existing fenders on the east wall—is identical to that in Note 6.  The drawings

and their accompanying notes, as would be expected, provide fender installation direction that is far more specific than the direction provided in Note 6.  The absence of a reference to the drawings on the bid schedule created no suggestion that a bidder was not bound to perform the work exactly as specified in those drawings, and RUSH had properly acknowledged the amendment containing the drawings.

Fourth, an examination of the solicitation shows that the agency initially did not include any "See Note" entries on the bid schedule.  In the original solicitation, the agency included five notes on the page immediately following the bid schedule, but it included no "See Note" entries on the bid schedule itself.[7]  Tab 1, AR 5-6 (original bid schedule); Tab 1, AR 7 (original list of five notes).  Prior to the agency's decision to annotate the bid schedule with "See Note" entries, bidders were bound by the direction in the notes, as well as by the direction throughout the solicitation, and every amendment thereto.  The addition of "See Notes" did not disturb those directions.

GAO's treatment of the erroneous "See Note" on the second page of RUSH's bid fails to consider fully the effect of RUSH's acknowledgment of Amendment no. 5.  GAO also fails to provide an explanation for its treatment of Note 6 in a manner that is at variance with the agency's expressed intention that Notes 6 and 9 serve as pricing notes to bidders.

(D)    Whether the GAO Decision was Rational

GAO found that the discrepancies on page two of RUSH's bid schedule, in particular the two erroneous references to "West Approach Wall Repair" and "See Note 9," constituted "material differences in the [solicited] work and the manner of its performance" and thus could not be waived.  Tab 38, AR 1122.

The court's review of GAO's decision is limited to the question of whether or not the decision is a rational one.  Honeywell, Inc., 870 F.2d at 647.  Even if GAO's decision is not a model of clarity, the court must stay its hand if GAO's decisional path may be reasonably discerned.  Bowman Transp., Inc., 419 U.S. at 285-86 (citing Colo. Interstate Gas Co., 324 U.S. at 595 ("[W]e will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned.)).

---

[7]    The agency did not include a "See Note" entry on the bid schedule for every note. Note 5 appeared in the original solicitation without a "See Note" reminder note on the original bid schedule.  The first reminder note for Note 5 appeared in the bid schedule accompanying Amendment no. 2, and it reappeared in subsequent bid schedules.  See, e.g., Tab 3, AR 441-43.

Regarding RUSH's omission of "See Note 6" on page two of its bid schedule, the court cannot discern from the record the path between GAO's observation that the omission constituted an error and GAO's conclusion that it also "reflected [a] material difference[] in the work and the manner of its performance." Tab 38, AR 1122. As discussed supra Part II.B.2, nothing in Pro Alarm Company supports such a conclusion. A careful review of the facts in the administrative record similarly fails to support the GAO's interpretation that a note on a bid schedule is necessary to find that the bidder "made a firm commitment to perform" the work specified in that note. See supra Part II.C.2.

GAO has relied on the legal principles set forth in three cases involving the omission of a price. But it has offered no explanation as to how these legal principles support the decision it reached in this case. See supra Part II.B.1. Whether the price of a particular item is divisible from a bid, and if so, whether the omission may be waived, are not pertinent legal issues in RUSH. Moreover, the three cases, HH & K Builders, Massillon Construction & Supply, and United Food Services, are all factually distinguishable from this one because, as the agency acknowledged, RUSH did not omit a price from its bid. See Tab 8; Tab 35, AR 1108. The three cases cited by GAO fail to provide the requisite support for its decision.

As to the erroneous "West Approach Wall" reference contained on page two of RUSH's bid schedule, GAO concluded that this error, along with the erroneous "See Note 9" reference, furnished evidence that "at the time of bid opening, RUSH had not made a firm commitment to perform the east wall scope of work at specific line item prices." Tab 38, AR 1121. But GAO did not address the four items of information contained on page two of RUSH's bid schedule that would have supported a conclusion that RUSH intended page two to reflect its east wall (option A) bid. See supra Part II.C.1. GAO's narrow focus on one fact—without any apparent consideration of the four other facts that undercut GAO's ultimate determination—is without rational explanation.

GAO seems to have accepted, without further analysis, C&D's allegation that RUSH's bid was ambiguous because both pages of RUSH's bid referred to west wall work, and neither page referred to east wall work. Tab 38, AR 1120 ("C&D argues that [both pages of RUSH's bid referring to the west wall] also rendered RUSH's bid ambiguous and unacceptable."). GAO then cited to Thompson Metal Fab for the proposition that "where a bidder's schedule does not clearly indicate that the prices apply to an option that the IFB requires to be priced, the bid is ambiguous and thus, nonresponsive." Id. at 1121 (emphasis added) (citing Thompson Metal Fab, Inc., 2004 WL 964056, at *1). GAO appears to have concluded summarily that RUSH's bid

schedule was ambiguous, without examining its own case law that sets forth standards for evaluating bid ambiguity.[8]

On various occasions, GAO has spoken directly to the manner in which an ambiguity is to be evaluated:

> Generally, an ambiguity in a bid exists where it is subject to two reasonable interpretations. High Country Equip., Inc., B-242669, Apr. 19, 1991, 91-1 CPD ¶ 392. An item in a bid that has more than one possible interpretation does not render a bid ambiguous if the application of reason serves to remove the doubt, leaving only one reasonable interpretation of the bid. Blueridge Gen., Inc., 71 Comp. Gen. 271 (1992), 92-1 CPD ¶ 218;51 Comp. Gen. 831 (1972).

Fire Security Sys., Inc., B-271740, 1996 WL 407572, at *2 (Comp. Gen. July 22, 1996).

> To be responsive, a bid must show on its face at the time of bid opening that it is an unqualified offer to comply with all the material requirements of the solicitation and that the bidder intends to be bound by the government's terms as set forth in the solicitation. John P. Ingram, Jr. & Assocs., Inc., B-250548, Feb. 9, 1993, 93-1 CPD ¶ 117 at 2. If the bid is subject to more than one reasonable interpretation, it is ambiguous and must be rejected as nonresponsive under the rigid rules applicable to sealed bid procurements. Sabreliner Corp., 64 Comp. Gen. 325, 328 (1985), 85-1 CPD ¶ 280 at 4.

J. Calderera & Co., 1997 WL 267537, at *1.

> The mere allegation that a bid is ambiguous does not make it so; an ambiguity only exists where two or more reasonable interpretations are possible. C.T. Bone, Inc., B-194436, Sept. 12, 1979, 79-2 CPD ¶ 190. Thus, an element of a writing in a bid may appear to be confusing and yet not constitute an ambiguity, where there is a single rational explanation, which removes all doubt on that point. Id.

Omni Elevator Co., B- 241678, 1991 WL 73014, at *2 (Comp. Gen. Feb. 25, 1991).

_____

[8] Because the court's review is limited to determining whether the GAO's decision was rational, the court offers no opinion as to whether RUSH's bid is ambiguous under GAO case law.

These cases, however, were not addressed here; nor do they appear to have been considered.

Rather, GAO seems to have premised its decision on inapposite case law, a narrow focus on one relevant fact (omission of "See Note 6"), and a failure to consider a number of other relevant facts. GAO's decision was not rational. Because the agency adopted GAO's irrational decision, the court finds that the agency's decision was arbitrary and capricious.

        (E)    Prejudice

To succeed on the merits, a bid protestor must show not only that there was an error in the procurement process, but also that it was prejudiced by the error. Data Gen. Corp. v. Johnson, 78 F.3d 1556, 1562 (Fed. Cir. 1996). In this respect, a protestor must demonstrate that there was a "substantial chance it would have received the . . . contract award, but for the alleged error in the procurement process." McAfee, Inc. v. United States, 111 Fed. Cl. 696, 712 (2013) (quoting Gentex Corp. v. United States, 58 Fed. Cl. 634, 653 (2003)); see also Alfa Laval Separation, Inc. v. United States, 175 F.3d 1365, 1367 (Fed. Cir. 1999).

Neither defendant nor C&D addressed the issue of prejudice.

The agency initially determined RUSH was the low bidder and awarded it the contract. Tab 16, AR 953; Tab 29, AR 1070-86. Although the agency has not terminated RUSH's contract yet, it has informed both RUSH and C&D that it will "adhere" to GAO's recommendation to do so. Tabs 39-40, AR 1126-27. But for the agency's error, the agency would have moved forward with the contract it had awarded to RUSH. For this reason, the court finds that RUSH was prejudiced by the agency's erroneous decision to follow GAO's recommendation to terminate its contract.

As RUSH Construction, Inc. has shown that the agency acted in an arbitrary and capricious manner, and shown that the agency's error was prejudicial, plaintiff's motion for judgment on the administrative record is **GRANTED.**

III.    Permanent Injunction

The Tucker Act grants this court the power to award "any relief that the court considers proper, including declaratory and injunctive relief" in bid protest cases. 28 U.S.C. § 1491(b)(2) (2012). To decide whether a permanent injunction is warranted,

the court must consider whether (1) the plaintiff has succeeded on the merits, (2) the plaintiff will suffer irreparable harm if the court withholds injunctive relief, (3) the balance of hardships to the respective parties favors the grant of injunctive relief, and (4) the public interest is served by a grant of injunctive relief.

Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (citing PGBA, LLC v. United States, 389 F.3d 1219, 1228-29 (Fed. Cir. 2004)).

No individual factor carries dispositive weight, and the court must "weigh and measure each factor against the other factors and against the form and magnitude of the relief requested." Standard Havens Prods., Inc. v. Gencor Indus., Inc., 897 F.2d 511, 513 (Fed. Cir. 1990) (discussing preliminary injunctions).[9]

Defendant asserts that plaintiff's standard of proof for a permanent injunction is clear and convincing evidence. Def.'s Mot. 20 (citing CW Gov't Travel, Inc. v. United States, 61 Fed. Cl. 559, 574 (2004); ABF Freight Sys. v. United States, 55 Fed. Cl. 392, 396 (2003)). RUSH and C&D were both silent on the question of RUSH's standard of proof for a permanent injunction.

In CW Government Travel, the court observed that the relevant standard of proof for a permanent injunction was clear and convincing evidence, while recognizing that a preponderance of the evidence standard also has been deemed proper. Because the outcome of that case did not depend upon the standard applied, the court declined to address further the requisite standard. CW Gov't Travel, Inc., 61 Fed. Cl. at 575 n.45 (citing Bannum, Inc. v. United States, 60 Fed. Cl. 718, 723-24 (2004)).

The court has issued several decisions since the 2004 issuance of the CW Government Travel decision, in which it has given careful consideration to plaintiff's standard of proof for injunctive relief. See CW Gov't Travel, Inc. v. United States, 110 Fed. Cl. 462, 494 n.7 (2013); Career Training Concepts, Inc. v. United States, 83 Fed. Cl. 215, 218-19 (2008); Textron, Inc. v. United States, 74 Fed. Cl. 277, 287 (2006).

In Career Training Concepts, the court engaged in a thorough discussion of injunctive relief, noting the disagreement in the case law regarding the standard of proof

---

[9]      There is no relevant difference between the standards for a preliminary injunction and a permanent injunction. See Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 546 n.12 (1987) ("The standard for a preliminary injunction is essentially the same as for a permanent injunction with the exception that the plaintiff must show a likelihood of success on the merits rather than actual success.").

and concluding that a preponderant evidence standard is the proper one.  Career Training Concepts, 83 Fed. Cl. at 218-19.

> On reflection, this court believes the proper standard is the preponderance of the evidence standard for injunctive relief, or demonstration of a fact as "more likely than not."  Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308 (2007) (citing Herman & MacLean v. Huddleston, 459 U.S. 375, 390 (1983)).  Utilizing the easier to prove, prevalent in civil cases, standard of proof of a preponderance of the evidence is more user friendly to the parties and furthers the public policy goal of open, accessible and fair government procurement in which each offeror becomes a participant and ombudsman to ensure those goals.

Id. at 219.  On several occasions, this court has stated that there is no binding precedent requiring this court to require the clear and convincing standard.  See CW Gov't Travel, Inc., 110 Fed. Cl. at 494 n.7; Career Training Concepts, 83 Fed. Cl. at 219; Textron, 74 Fed. Cl. at 287.

This court agrees with the reasoning set forth in the 2013 CW Government Travel decision, as well as in the Career Training Concepts and Textron cases.  Thus the court finds that plaintiff must carry its burden by a preponderance of the evidence.  The court further finds that RUSH has succeeded on the merits of its claim.  See supra Part II.E.

The court considers the remaining factors in turn.

A.    Irreparable Harm

"When assessing irreparable injury, '[t]he relevant inquiry in weighing this factor is whether plaintiff has an adequate remedy in the absence of an injunction.'"  CW Gov't Travel, 110 Fed. Cl. at 494 (quoting Overstreet Elec. Co. v. United States, 47 Fed. Cl. 728, 743 (2000)).  Irreparable harm is satisfied when denying injunctive relief would cause a protestor to "lose a valuable contract that it has lawfully won."  Sys. Application & Techs., Inc., v. United States, 100 Fed. Cl. 687, 720-21 (2011).

RUSH points to the loss of potential profits from the redirected contract award as constituting irreparable harm.  Pl.'s Mot. 36 (citing BCPeabody Constr. Servs., Inc. v. United States, 112 Fed. Cl. 502, 514 (2013); Furniture by Thurston v. United States, 103 Fed. Cl. 505, 520 (2012); OTI Am., Inc. v. United States, 68 Fed. Cl. 646, 659 (2005); United Payors & Providers Health Srvs. v. United States, 55 Fed. Cl. 323, 333 (2003)).

C&D argues that RUSH will suffer no irreparable harm because its bid was unresponsive.  Def.-Int.'s Mot. 25.  C&D adds that any irreparable harm claimed is the result of RUSH's own actions.  Id.

Defendant argues that for a showing of irreparable harm, a loss requires more than a mere showing of lost profits; rather, the alleged loss must be sufficiently severe that it threatens the survival of the movant's business.  Def.'s Mot. 20-21 (citing Sierra Military Health Servs., Inc. v. United States, 58 Fed. Cl. 573, 582 (2003); Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997)).  Because RUSH has made no allegation that the loss of this contract would imperil its business, argues defendant, RUSH's allegation of harm fails to rise to the level of irreparable harm.  Id. at 21.

Defendant takes the position that were this court to accept lost profits as a sufficient showing of irreparable harm, it would create a presumption in favor of injunctive relief which is contrary to Supreme Court precedent.  Id. (citing eBay, Inc. v. MercExchange, L.L.C., 547 U.S. 388, 391-93 (2006); Amoco Prod. Co. v. Village of Gambell, Alaska, 480 U.S. 531, 544-45 (1987)).

In eBay, the Supreme Court considered the then-practice of the Federal Circuit of promoting the "'general rule that courts will issue permanent injunctions against patent infringement absent exceptional circumstances,'" eBay, 547 U.S. at 391 (quoting MercExchange, LLC v. eBay, Inc., 401 F.3d 1323, 1339 (Fed. Cir. 2005)), and determined that the practice was inconsistent with "traditional principles of equity," id. at 394.  The Court vacated the Federal Circuit's decision, based upon its presumption in favor of permanent injunction, and remanded the case to the district court to consider whether a permanent injunction was warranted under the same four-factor test now in use in this court.  Id. at 394; see id. at 391 (citing Weinberger v. Romero-Barcelo, 456 U.S. 305, 311-313 (1982); Amoco Prod., 480 U.S. at 542).

In Amoco Production, the district court denied the complainant Village a preliminary injunction to stop Amoco's exploratory activities, finding that the Village had not satisfied the "traditional test for preliminary injunction[s]."  Amoco Prod., 480 U.S. at 540.  The Ninth Circuit reversed, finding that, inter alia, the district court had "balanced irreparable harm" improperly.  Id. at 541.  In granting an injunction, the Ninth Circuit stated that "'[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action.'"  Id. (quoting Village of Gambell v. Hodel, 774 F.2d 1414, 1423 (9th Cir. 1985)).  The Court found that the presumption applied by the Ninth Circuit "is contrary to traditional equitable principles," id. at 545, and based on this error and the erroneous evaluation of another injunctive

relief prong, the Court found that the Ninth Circuit had "erred in directing the issuance of a preliminary injunction," id. at 546.

The case at hand is distinguishable from the eBay and Amoco Production cases because contrary to defendant's characterization, the acceptance of lost profits as a satisfactory showing of irreparable harm does not create a presumption that the court will award a permanent injunction. Nor does the court purport to establish such a presumption. Thus, neither eBay nor Amoco Production are applicable on these facts.

The court notes that the government has offered unsuccessfully the same argument previously—that is, equating proof of lost profits with a presumption favoring the entry of a permanent injunction. In the two earlier unrelated cases, defendant relied, as it does here, on the decisions in eBay, Sierra Military Health Services, and Minor Metals. See Caddell Constr. Co., Inc. v. United States, 111 Fed. Cl. 49, 115-16 (2013); MORI Assoc., Inc. v. United States, 102 Fed. Cl. 503, 552 (2011).

In Caddell Construction,

[d]efendant argue[d] that plaintiff's alleged harm does not amount to . . . irreparable harm because it is only economic in nature. Defendant cite[d] Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 381-82 (1997), for the proposition that "economic harm, without more, does not seem to rise to the level of irreparable injury," and Sierra Military Health Services., Inc. v. United States, 58 Fed. Cl. 573, 582 (2003), for the position that "'[o]nly economic loss that threatens the survival of a movant's business constitutes irreparable harm.'"

Caddell Constr. Co., 111 Fed. Cl. at 115.

In MORI Associates,

[t]he government contend[ed] that "[e]conomic harm alone, however, is not sufficient to establish irreparable injury," citing an opinion of [the] court in which the protester was not precluded from competing under a solicitation. See Def.'s Cancel'n Br. at 25 (citing Minor Metals, Inc. v. United States, 38 Fed. Cl. 379, 382 (1997)). The government's other authority for this proposition [was] an opinion in a case in which the protester was alleging other sorts of financial harms, but not lost profits. See Sierra Military Health Servs., Inc. v. United States, 58 Fed. Cl. 573, 582 (2003) (distinguishing cases involving lost profits because "[i]n this case,

[plaintiff] will not lose business and profit on the T-Nex contract" and "will still have the opportunity to obtain the contract").

MORI Assoc., 102 Fed. Cl. at 552 (some alterations in original).

Here the court concurs with the considered reasoning set forth, and the ultimate rejection of defendant's arguments, in both Caddell Construction and MORI Associates. Caddell Constr. Co., 111 Fed. Cl. at 115-16 (finding no merit in defendant's argument, and stating that decisions of this court have simply "recognized that, in some circumstances, the loss of a business opportunity, coupled with an unfair procurement process, may result in irreparable harm to a plaintiff"); MORI Assoc., 102 Fed. Cl. at 552 ("But to recognize that meritorious bid protests that involve lost profits will satisfy the irreparable harm factor is not the same as automatically granting an injunction, as the other two factors must still be considered.").

The agency initially designated RUSH as the low responsive bidder, but now has expressed an intention to redirect the contract award to another bidder.  The loss of the contract will cause RUSH economic harm.  RUSH has no remedy, other than this protest, to reclaim the contract plus any profits from the contract that it would have earned.  It is the view of the court that in the absence of a permanent injunction, RUSH will suffer irreparable harm.

B.       The Balance of Hardships

When evaluating the balance of hardships, the court weighs the irreparable harm plaintiff would suffer absent an injunction against the harm such an injunction would inflict on defendant and defendant-intervenor.  See Sheridan Corp. v. United States, 94 Fed. Cl. 663, 670 (2010) (citing Reilly's Wholesale Produce v. United States, 73 Fed. Cl. 705, 715-16 (2006)).

RUSH asserts it should prevail on the balance of hardships prong, because, without a permanent injunction, it would suffer the loss of potential profits.  Pl.'s Mot. 37.  RUSH, as the contract awardee, desires to keep the contract.  Allowing RUSH to perform the contract as awarded would avoid the need for a transition between contractors and thus, as RUSH contends, the brief delay in contract performance occasioned by this protest would not warrant a denial of the injunctive relief RUSH seeks.  Id. (citing Univ. Research Co., LLC v. United States, 65 Fed. Cl. 500, 514 (2005) (declining to find that delay in transition from the incumbent contractor to plaintiff would warrant denial of preliminary injunctive relief)).

The government has taken no position on the balance of hardships.  See Def.'s Mot. 19-22.  But C&D argues that the balance of hardships favors the government and itself, not RUSH.

C&D asserts that although RUSH is not entitled to the award of the contract, it nonetheless risks losing—to RUSH—the opportunity to perform the contract.  Def.-Int.'s Mot. 25.  C&D points out that it has begun preparation for contract performance by setting aside certain resources, and it notes that to the extent these resources are unused pending this protest, C&D cannot recapture any lost value.  Id. at 25-26.  C&D adds that while it awaits a decision, it is "forced to refrain from taking on replacement or additional work," a circumstance it asserts that reasonably can be considered a financial hardship.  Id. at 26.

The court finds C&D's arguments unpersuasive.  The record shows that the agency awarded the contract to RUSH, Tab 29, AR 1070-72, then informed both RUSH and C&D that it would follow GAO's recommendation to cancel the contract to RUSH and award it to C&D, Tabs 39-40, AR 1126-27.  Yet, defendant has agreed to await for the outcome of this protest before taking the intended action.  Compl. ¶¶ 23, 129.

There is no indication that the government's burden would vary significantly with the outcome of this protest; in fact, the burden may be slightly less with an award to RUSH, because the agency has already verified that RUSH is a responsible bidder, Tab 20, AR 1021, and awarded it the contract, Tab 29, AR 1070-72.  These verification steps would have to begin anew if the agency were to issue C&D the contract.

The record supports a finding that C&D: (1) was not the low bidder; (2) was the beneficiary of an irrational GAO decision; and (3) has not prevailed in this forum.  Because RUSH was the successful bidder at the agency level and has prevailed in its protest with this court, its financial loss is taken as a greater harm than C&D's financial loss would be.

C.    Public Interest

The public has a strong interest in ensuring that the government procurement process is fair.  PGBA, LLC v. United States, 60 Fed. Cl. 196, 221 (2004), aff'd, 389 F.3d 1219 (Fed. Cir. 2004); PCI/RCI v. United States, 36 Fed. Cl. 761, 776 (1996) (holding that the public interest in protecting the integrity of the procurement system from irrational conduct was served by granting a permanent injunction).

RUSH takes the position that granting it "injunctive relief would further the overriding and predominating public concern for preserving fair and open competition." Pl.'s Mot. 38.

Defendant asserts that in this matter, the "GAO protest preserved the integrity of the procurement system," and that the possibility of this court "enjoining [the] agency from following a GAO recommendation may upset the integrity of GAO protest system." Def.'s Mot. 22.

C&D takes the position that the agency conducted a fair procurement and properly exercised its discretion in following GAO's recommendation, which it asserts was rational. C&D adds that the public interest would best be served by bringing an end to any delay and allowing the agency to proceed with a contract award to C&D. Def.-Int.'s Mot. 26.

It is the view of the court that the public interest weighs in RUSH's favor. While it is true that GAO plays an important role in maintaining a fair and even-handed federal procurement system, so too does the court. The agency determined that RUSH was the responsive, low-bidder. While C&D was within its rights to file a protest with GAO, C&D ought not to benefit from an irrational GAO decision. The public interest is not well-served by allowing a GAO decision—wanting for reasonableness—to control the outcome of a federal procurement.

IV.    Conclusion

For the reasons discussed fully above, supra Part II.B.-E., the court finds that the Army Corps of Engineers Jacksonville District was arbitrary and capricious in implementing the GAO's recommendation to cancel the contract award to RUSH, because the GAO recommendation on which the agency relied was an irrational one. Accordingly, plaintiff's motion for judgment on the administrative record is **GRANTED**, defendant's cross-motion for judgment on the administrative record is **DENIED**, and defendant-intervenor's cross-motion for judgment on the administrative record is **DENIED**.

For the reasons discussed fully above, <u>supra</u> Part III., the court finds that the balance of permanent injunction factors favors RUSH.  Thus, plaintiff's request for a permanent injunction is **GRANTED**.  The Clerk will enter judgment remanding this case to the contracting officer for appropriate action consistent with Opinion and Order.  No costs.

IT IS SO ORDERED.

<u>s/ Patricia E. Campbell-Smith</u>
PATRICIA E. CAMPBELL-SMITH
Chief Judge
